ACCEPTED
13-14-00565-CV
THIRTEENTH COURT OF APPEALS
CORPUS CHRISTI, TEXAS
7/21/2015 4:07:39 PM
CECILE FOY GSANGER
CLERK

## NO.  13-14-00565-CV

## IN THE THIRTEENTH COURT OF APPEALS

FILED IN
13th COURT OF APPEALS
CORPUS CHRISTI/EDINBURG, TEXAS
7/21/2015 4:07:39 PM
CECILE FOY GSANGER
Clerk

## CORPUS CHRISTI, TEXAS

_____

### FRANCIS W.  SINATRA
#### Appellant

#### v.

### CYNTHIA SINATRA,
#### Appellee

_____

**Appealed from the 329th Judicial District Court, Wharton County, Texas**

_____

## APPELLANT'S REPLY BRIEF

_____

LYNN KURIGER STANTON  
State Bar No. 11767600  
JENKINS & KAMIN, L.L.P.  
TWO GREENWAY PLAZA, STE.  600  
HOUSTON, TEXAS 77046  
TEL:  (713) 600-5500  
FAX: (713) 600-5501  
lstanton@jenkinskamin.com  

WARREN COLE  
State Bar No.  04549500  
LAW OFFICE OF WARREN COLE  
3355 W.  ALABAMA, STE.  825  
HOUSTON, TEXAS 77098  
TEL:  (713) 275-4444  
FAX:  (713) 400-9144  
warren@warcolelaw.com  

ATTORNEYS FOR APPELLANT  
FRANCIS W.  SINATRA, JR.

## ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

**Table of Contents** ...............................................................................................ii

**Index of Authorities** .........................................................................................iv

**Issues Presented** [Restated]............................................................................vii

**Argument and Authorities**

I. **Reply and Additional Argument on Issue One**
   *[Relating to Court's Ruling of Informal Marriage]* ....................................1

   A. **Introduction and Scope of Frank's Reply on Informal
      Marriage** ......................................................................................1

   B. **Summary of Direct and Circumstantial Evidence "For" and
      "Against" Common Law Marriage** ...................................................3

      1. Analysis of Cynthia's claim of agreement to be
         married contrasted with Frank's evidence showing
         no agreement ..........................................................................4

         a. Cynthia's meager evidence favoring an agreement
            does not rise above a bare scintilla .................................4

         b. Preponderance of evidence offered by Cynthia and
            Frank is contrary to any agreement to be married...........6

      2. Analysis of Cynthia's claim of living together in Texas,
         contrasted with Cynthia's and Frank's evidence showing
         he has always lived in California ...........................................13

         a. Preponderance of evidence offered by Cynthia and
            Frank is contrary to court's ruling ................................13

     b.      Additional rebuttal on Cynthia's claim of living together ........................................................................15

**II.** **Reply and Additional Argument on Issue Two and Issue Three [*Relating to Court's Ruling on Frank's Hensal Road home and $500,000 equalization judgment* ]** ............................................18

    **A.**    **Frank met his burden of proof to show that the Hensal Road home was his separate property** ...........................................18

    **B.**    **The court abused its discretion when it allowed Cynthia to withdraw her stipulation that the Francis W. Sinatra Trust was separate property because the stipulation was binding and conclusive as to the fact conceded and Cynthia was estopped from claiming to the contrary** ...................21

    **C.**    **Frank disputes Cynthia's arguments regarding the state of discovery, Charles Gerhardt's testimony and the inventory prepared by him.** ...........................................24

**Prayer for Relief** ........................................................................28

**Certificate of Compliance** ........................................................30

**Certificate of Service** ...............................................................31

**Index to Appendix** ...................................................................32

**A**    **Cynthia - Frank Correspondence [Petitioner's Exhibits 29 - 32; Respondent's Exhibits 36, 38]**

**B**    **Correspondent relating to Discovery [Petitioner's Exhibits A, B, C. D]**

# INDEX OF AUTHORITIES

**Cases**

*Bomar Oil and Gas, Inc. v. Loyd,* 381 S.W.3d 689
  (Tex.App.–Amarillo 2012, pet. denied) .......................................................24

*Boyd v. Boyd,* 131 S.W.3d 605 (Tex.App.–Fort Worth
  2004, no pet.) ...............................................................................................20

*Burden v. Burden*, 420 S.W.3d 305
   (Tex.App.–Texarkana 2013, no pet.). .......................................................4, 8

*City of Keller v. Wilson,* 168 S.W.3d 802 (Tex. 2005). ................................2, 6, 13

*Farrell v. Farrell,* 459 S.W.3d 114 (Tex.App.–
  El Paso 2015, no pet.) ...................................................................................7

*Gary v. Gary,* 490 S.W.2d 929(Tex.Civ.App.–Tyler
  1973, writ ref'd n.r.e.) ...................................................................................4

*Gulf Coast Construction Co. v. Self,* 676 S.W.2d 624
  (Tex.App.–Corpus Christi 1984, writ ref'd n.r.e.) .......................................22

*Hart v. Webster,* 2006 WL 1707975 (Tex.App.–Austin
  2006, no pet.) ...............................................................................................12

*In the Interest of C.M.V.,* —S.W.3d—, 2015 WL 2265388
  (Tex.App.–El Paso 2015, no pet. h.) .............................................................4

*In the Matter of the Marriage of Tandy,* 532 S.W.2d 714
  (Tex.Civ.App.–Amarillo 1976, no writ) .......................................................21

*Lewis v. Anderson,* 173 S.W.3d 556
  (Tex.App.–Dallas 2005, pet. denied). .....................................................4, 12

*Lozano v. Lozano,* 52 S.W.3d 141 (Tex. 2001) ........................................................7

*Mills v. Mest,* 94 S.W.3d 72 (Tex.App.–Houston
[1ˢᵗ Dist.] 2002, pet. denied) ...........................................................................8

*Moroch v. Collins,* 174 S.W.3d 849 (Tex.App.–
Dallas 2005, pet. denied).................................................................................21

*Russell v. Russell,* 865 S.W.2d 929 (Tex. 1993) ................................................5, 15

*Small v.McMaster,* 352 S.W.3d 280 (Tex.App.–Houston
[14ᵗʰ Dist.] 2011, pet. denied) ..........................................................................4

*Thomas v. Sun Life Assurance Co. of Canada,* 2010 WL 2991116
(S.D. Tex. 2010) ................................................................................5, 6, 15

*Tompkins v. State*, 774 S.W.2d 195 (Tex.Crim.App. 1987) ...................................4

*Welder v. Welder,* 794 S.W.2d 420 (Tex.App.–Corpus Christi
1990, no writ) ..............................................................................................20, 21

*Winfield v. Renfro,* 621 S.W.2d 640(Tex.App.–Houston
[1ˢᵗ Dist.] 1991, writ denied). .....................................................................4, 9

*Zagorski v. Zagorski*, 116 S.W.3d 309 (Tex.App.–Houston
[14ᵗʰ Dist.] 2003, pet. denied) ..................................................................20, 21

## Statutes and Rules

TEX. FAM. CODE § 2.401 ..................................................................................3, 7

TEX. CIV. PRAC. & REM. CODE, Chapter 10 ..........................................................7

TEX.R.CIV.P. 13 ...................................................................................................7

# ISSUES PRESENTED
[Restated]

## *Issue Relating to Informal Marriage*
### Issue One

**The trial court abused its discretion when it ruled that Frank and Cynthia entered into an informal marriage on or before April 27, 2002, because there is legally insufficient, or alternatively, factually insufficient evidence to establish the requisite elements: (1) an agreement to be married; (2) after the agreement, living together in Texas as husband and wife; and (3) representing to others in Texas that they are married.** [Challenging Final Decree CR 193, 208-209; Interlocutory Order-Common Law Marriage CR 156-57; Findings of Fact and Conclusions of Law CR 224-25 at ¶¶ 3, 4, 5, 7, 11, 13, 26; See, Request for Additional and Amended Findings of Fact and Conclusions of Law CR226-27 at ¶¶ 1, 2, 3, 4 CR 229 at ¶ 11, See also Motion for New Trial CR 217 at ¶¶ 5, 6]

## *Issues Relating to Characterization and Division of Property*

Because Frank contends that the trial court's ruling on common law-informal marriage is contrary to Texas law and should be reversed, he also contends that all subsequent rulings which purport to divide a community estate and which characterize portions of Frank's separate property as owned by the non-existent community estate and awarded to Cynthia are an abuse of discretion and erroneous as a matter of law. However, in the event the Honorable Court upholds the common law marriage theory, then Frank presents the following additional issues complaining of the trial court's Final Decree of Divorce.

## Issue Two

**Because the evidence was legally and factually insufficient to establish the community property character of the Hensal Road home and the funding into the trust's bank account which purchased the home, the trial court erred when it failed to confirm the Francis W. Sinatra Trust as Frank's separate property, when it mischaracterized the funds that had purchased the Hensal Road house as community property, and when it awarded one-half of the Hensal Road house to Cynthia.** [Challenging Final Decree at CR 194-95, 196-97, 198-99, 201-02; Findings of Fact and Conclusions of Law at CR 224-25, ¶¶ 7, 14, 16, 28; RR 6: 59-60; See, Requests for Additional and Amended Findings of Fact and Conclusions of Law at CR227 ¶¶ 5, 6, CR 228 at ¶ 9, CR 229 at ¶ 12, CR 230 at ¶ 13; See also Motion for New Trial CR 218 at ¶¶ 7, 8, 9]

## Issue Three

**The trial court abused its discretion when it ordered Frank to pay Cynthia a judgment in the amount of $500,000 to equalize its division, because there is legally insufficient, or alternatively, factually insufficient evidence to support the court's finding that Frank had possession and control of $1,000,000 in unspent cash and earnings paid to him during marriage.** [Challenging Final Decree at CR 202; Findings of Fact and Conclusions of Law at CR 224-25, ¶¶ 13, 28; RR 6: 61-62; See, Requests for Additional and Amended Findings of Fact and Conclusions of Law at CR 227-28 at ¶¶ 7, 8, CR 230 at ¶ 14; See also Motion for New Trial at CR 218-19, ¶ 10]

## Issue Four

**The trial court's mischaracterization of the Hensal Road house as community property, together with the equalization judgment of $500,000, caused the trial court to abuse its discretion in making its property division where the values of the assets and the equalization judgment awarded to Cynthia resulted in a manifestly unfair, unjust, and disproportionate division of the marital estate which is not "just and right" and which is not supported by legally and factually sufficient evidence.** [Challenging Final Decree at CR 194-200, 202-03; Findings of Fact and Conclusions of Law at CR 1 - 2, ¶¶ 7, 11, 13, 14, 28; See, Requests for Additional and Amended Findings of Fact and Conclusions of Law at

CR227 ¶¶ 5, 6, 7, 8, CR 228 at ¶ 7, 8, 9, CR 229 at ¶ 12, CR 230 at ¶¶ 13, 14]


**Issue Five**

      **The trial court abused its discretion when it ordered Frank to pay Cynthia $5,000 per month, because the evidence is legally insufficient, or alternatively, factually insufficient to support the statutory prerequisites for spousal maintenance.** [Challenging Final Decree at CR 202-03; Findings of Fact and Conclusions of Law at CR 225, ¶¶ 21, 22, 23; RR 6: 62-63; See, Requests for Additional and Amended Findings of Fact and Conclusions of Law CR 229 at ¶¶ 19, 11; See also, Motion for New Trial at CR 219, ¶ 11]

## ARGUMENT AND AUTHORITIES

**I.** **Reply and Additional Argument on Issue One**
**[*Relating to Court's Ruling of Informal Marriage*]**

**A.** ***Introduction and Scope of Frank's Reply on Informal Marriage****.*

In order to prove the existence of an informal marriage, a proponent is required to prove each of three statutory elements. *See* TEX. FAM CODE § 2.401(a)(2). Cynthia contends that because she presented some evidence on each of the three elements, the judgment must be affirmed without regard to undisputed facts which rendered Cynthia's supporting evidence incompetent.

Frank disputes Cynthia's interpretations of proper evidentiary review. The trial court was not free to believe Cynthia and her claim of informal marriage when Cynthia herself offered irreconcilable and shifting versions of events which were negated by Cynthia herself in her pleadings, trial testimony, and documentary evidence. Without regard for the requirement that a fact-finder's determinations on credibility must be reasonable, she argues this Court must give absolute deference to the trial court's acceptance of Cynthia as a credible witness and the weight to be given her testimony.

Frank contends that Cynthia's evidence should not be afforded automatic acceptance as to either its credibility or to its probative weight. The reasoning

1

contained in *City of Keller v. Wilson* is key to analyzing and weighing the evidence as to both legal and factual sufficiency. *City of Keller v. Wilson,* 168 S.W.3d 802, 811-12, 820 (Tex. 2005). Drawing from *City of Keller*, Frank contends the following standards apply to this case:

- The traditional rule for a no-evidence review has never been that appellate courts must reject contrary evidence, noting that in some circumstances contrary evidence renders supporting evidence incompetent. *Id.* at 810.

- Evidence cannot be taken out of context in a way that makes it seem to support a verdict when in fact it never did. *Id.* at 812.

- When circumstances are equally consistent with either of two facts, neither fact may be inferred; in such a case each piece of circumstantial evidence must be viewed, not in isolation, but in light of all the known circumstances. *Id.* at 813-14.

- When circumstantial evidence of a vital fact is meager, a reviewing court must consider not just favorable evidence but all competing inferences as well. *Id.* at 814.

- Decisions by the jury (fact-finder) regarding credibility must be reasonable; jurors (fact-finder) are not free to believe testimony that is conclusively negated by undisputed facts. *Id.* at 820.

In this Reply, Frank reiterates his challenges: (1) there is no objective evidence to show that Frank entered into an agreement to remarry Cynthia following their March 29, 2001 divorce; and (2) the preponderance of the evidence refutes Cynthia's contention that they lived together in Texas and throughout the world, at all times

2

possible, from 2001 through 2012. [1]

As to the third element of " . . . there represented to others that they were married," Frank has not disputed his introductions of Cynthia as "wife." However, Frank has explained the context of his "wife" references. Frank has insisted he was not married to Cynthia after 2001, but as a gentleman, he did not choose to embarrass Cynthia, he wanted to avoid bad feelings, and he took pride in her companionship as a beautiful and intelligent woman. [Appellant's Brief, pp. 29-32] In addition to the "wife" introductions, Frank also believed it necessary to make the extraordinary financial expenditures during the post-divorce years in order to retain her companionship. As it turned out, he was right. Cynthia admitted she would probably not have filed this lawsuit but for the fact that the money stopped coming. [RR 5:49]

The trial court's ruling of common law marriage must be reversed because two of the requisite elements are lacking evidentiary support.

B. ***Summary of Direct and Circumstantial Evidence "For" and "Against" Common Law Marriage***.

In addition to the facts, argument, and authorities presented in Appellant's Brief [pp. 1 - 33], Frank presents the following evidence and argument

---

[1] Cynthia's reliance on representations outside the state of Texas and her allegations of living together in California and throughout the world are irrelevant. The statute requires the elements to be met in Texas. *See* TEX.FAM.CODE §2.401(a)(2)(including ". . . they lived together in this state as husband and wife and there [Texas] represented to others that they were married.").

3

as supplement to his prior brief.

**1.     Analysis of Cynthia's Claim of "Agreement to be Married" as Contrasted with Frank's Evidence Showing "No Agreement."**

Texas law on "agreed to be married" is well-settled.   Cynthia had the burden to prove that she and Frank <u>agreed to create a present, immediate, and permanent marriage relationship in Texas</u> , and the agreement had <u>to be specific</u> and <u>made by both sides</u>.  *See, e.g., In the Interest of C.M.V.,* —S.W.3d—, 2015 WL 2265388, * 6 (Tex.App.–El Paso 2015, no pet. h.);  *Burden v. Burden,* 420 S.W.3d 305, 308 (Tex.App.–Texarkana 2013, no pet.); *Small v.McMaster,* 352 S.W.3d 280, 283 (Tex.App.–Houston [14th Dist.] 2011, pet. denied); *Winfield v. Renfro,* 621 S.W.32d 640, 645 (Tex.App.–Houston [1st Dist.] 1991, writ denied); *see also  Lewis v. Anderson,* 173 S.W.3d 556, 560 (Tex.App.–Dallas 2005, pet. denied); *see also Tompkins v. State,* 774 S.W.2d 195, 208 (Tex.Crim.App. 1987); *Gary v. Gary,* 490 S.W.2d 929, 932 (Tex.Civ.App.–Tyler 1973, writ ref'd n.r.e.).

**a.     Cynthia's Meager Evidence Supporting 'Agreement' Does Not Rise Above a Bare Scintilla.**

At trial and in her pleadings, Cynthia did not rely on circumstantial evidence to support a tacit agreement.  She presented <u>direct evidence of an express agreement </u>to be married.  When a party such as Cynthia offers direct evidence, her testimony should not be viewed in isolation.  It should be tested in the

4

context of her other testimony and documentary, objective evidence on informal marriage. When direct evidence is offered by the marriage proponent, and it is found to be uncorroborated, unbolstered, and contradicted by the proponent herself, it would be improper to rely only on circumstantial evidence to find a tacit agreement. *See generally Russell v. Russell,* 865 S.W.2d at 932 (when direct evidence is <u>not</u> offered, the fact-finder may look to circumstantial evidence); *see also Thomas v. Sun Life Assurance Co. of Canada,* 2010 WL 2991116, *3 (S.D. Tex. 2010)(in cases where agreement was found over the denial of the non-proponent, there was objective evidence which showed the non-proponent's agreement, such as jointly filed tax returns, signing legal documents as a married person, owning joint bank accounts, joint ownership of property as husband and wife).

Cynthia testified that she and Frank continued to share each other's lives after the March 29, 2001 divorce, just as before. [RR 2: 349-50] She testified they had a routine as husband and wife that did not change after March 29:

> **I understand that we were married and then we were divorced and that the common-law marriage began as soon as the divorce was final**. [RR 3: 14]

As to the vital element of "agreed to be married," the court's question to Cynthia elicited only a cursory response.

THE COURT: "You're sitting here in court today telling me that you and Frank, despite your divorce, agreed to continue your marriage. I think I heard you say that."

MRS. SINATRA: **"Yes, that's what I'm saying."** [RR 3: 86-7]

The court's question and Cynthia's response do not show the requisite intent to create an immediate and permanent marriage relationship in the state of Texas. Because Cynthia's evidence in support of the vital fact of an agreement to be married failed to meet the standards set out in the case authorities referenced above, and she did not any present objective evidence as described in *Thomas v. Sun Life Assurance,* the reviewing court should consider all the evidence, including contrary evidence. *City of Keller v. Wilson,* 168 S.W.3d at 814.

**b.** **Preponderance of Evidence Offered by Both Cynthia and Frank is Contrary to Any Agreement to Be Married**.

Frank flatly denied that he and Cynthia ever agreed to be remarried following their March 29, 2001 divorce**.** [RR 3: 97**,** 108**]** [2]

Cynthia offered direct testimony and made pleading allegations which presented contradictory dates and stories concerning when the parties were informally married, *i.e.*, when she and Frank allegedly agreed to be remarried. (May 2001 [CR 10]; February 7, 2000 [CR 21]; April 29, 2001 [CR 42]; March 29, 2001

[2] In briefing, Cynthia claims that Frank tried to retract his statement of agreement. [Appellee's Brief, p. 36] Frank did not ever make any statement of agreement that would be subject to retraction. Frank did explain the context and reasoning of his references to Cynthia as "wife," which likewise, were not retractions.

[CR 84]; March 30, 2001 [RR 3: 14]; April 2002 [RR 3: 15]).[3] The variety of dates contained in the pleading allegations violated Texas' rules of pleading and practice which require that signatures on pleadings constitute certification of evidentiary support for factual assertions and claims. *See generally* TEX.R.CIV.P. 13; TEX.CIV.PRAC.& REM.CODE, Chapter 10. Despite the prohibitions against groundless pleading allegations contained in Tex.R.Civ.P. 13 and Section 10, Tex.Civ.Prac.& Rem. Code, Cynthia, *pro se,* or subsequent attorneys acting at her behest, signed and filed pleadings which could not all be true.

Because Cynthia's differing dates for the "agreement" were internally inconsistent, the trial court could and should have found that Cynthia simply changed the dates to accommodate the scenario she was trying to create. Even though she had been the petitioner, Cynthia told the judge that she couldn't really remember the circumstances in 2001 as to why they got a divorce, concluding: **"Perhaps – I don't remember."** [RR 3: 88] Cynthia's evidence has the legal effect of "no evidence" on the element of 'agreed to be married.' *See Lozano v. Lozano,* 52 S.W.3d 141, 148 (Tex. 2001)(applying the equal inference rule which is a species of the no evidence rule, and emphasizing that when circumstantial evidence is so slight that any

---

[3] The plain language of the statute requires the agreement to occur first in time and then living together in Texas as husband and wife *after* the agreement. TEX.FAM.CODE § 2.401; *see also Farrell v. Farrell,* 459 S.W.3d 114, 117 (Tex.App.–El Paso 2015, no pet.).

7

plausible inference is purely a guess, it is "no evidence."); *see also Mills v. Mest,* 94 S.W.3d 72, 75-76 (Tex.App.–Houston [14th Dist.] 2002, pet. denied).[4]

Following their 2001 divorce, Frank contends that even though he and Cynthia engaged in periods of intimacy and friendship, the documentary evidence and the parties' conduct established that no agreement ever occurred and no marriage existed. For example, at trial Cynthia offered letters which defeat her claim of a post-divorce, informal marriage. There is no instance in any of the faxed letters between Cynthia and Frank where the parties mention remarriage, or any agreement to be remarried, or any discussion of a then-existent marriage. [ RR 8: PX 29 - PX 34; RR 24: RX-36, RX-38] Instead, Cynthia refers to "our relationship" and never refers to "our marriage." When the relationship was in trouble, Cynthia writes of "going our own way," or "go on with your life," which showed Cynthia's understanding of their relationship which could be ended by either party. *See Burden v. Burden,* 420 S.W.3d at 308; *Winfield v. Renfro,* 821 S.W.2d at 645. [5]  Reading through the sampling of

---

[4] The trial court was also unwilling to commit to a date when the parties agreed to be married. Frank specifically requested the court to amend its findings to state when each element of informal marriage occurred and the date upon which all 3 elements concurred. [CR 229 at No. 11]

[5] For example, Cynthia set forth detailed requests for money and concluded: "I know that your life has moved on, and I will always care about you and love you. Perhaps after I get a job, we can communicate like in old days as friends." [RR 8: PX 30] In an October 1, 2009, letter which presented an astonishing juxtaposition of monetary requests, scoldings, and complaints interspersed with love-language, Cynthia herself acknowledged the deteriorating relationship but made no marital allegations. For example: "I wanted to be able to share my life

letters offered by Cynthia reveals the relationship was about Cynthia's requests for more money, Frank running out of money, and Frank left with no assurance that he could enjoy Cynthia's companionship. [RR 8: PX 27, PX 28, PX 30, PX 31, PX 33, PX 34 ("Thank you for telling me just where I stand in your estimation for your life, and also the one thing I seem to be good for. $" )]

Even when Frank told Cynthia about his relationship with Leslie and the 2004 birth of their daughter, Josie, Cynthia's own testimony shows that her reaction was not that of an aggrieved wife, but rather, she focused on the money that Frank was spending on Leslie and Josie. Cynthia complained: "He bought someone else a house and started giving her support instead of me." [RR 3: 28-29] Cynthia admitted that she had known about Josie's birth soon afterward, but in the beginning she did not know how much money he was providing to Leslie and Josie. [RR 3: 28-29]

The Cynthia-Frank letters show a relationship which deteriorated due to Frank's inability to fund Cynthia's lifestyle, but the letters do not evidence a second marriage. In fact, Frank wrote "when we _were_ married . . ." in a September 29, 2009 letter, and Cynthia did not dispute his past-tense reference in her answering

---

with my Francis, but life has moved on.  My Francis has a life that he is comfortable in, and I am not a part of it." [RR 8: PX 32]

letter of October 1, 2009. [See Cynthia's trial exhibits, RR 8: PX 29, PX 30, PX 31, PX 32, PX 33, PX 34] In our case, Cynthia's own proffered documentary evidence shows they had a relationship which could be ended at any time by either party, with that result contemplated by Cynthia herself when she wrote of 'life moving on.'

Cynthia presented additional documents which underscored the fact that Cynthia herself was aware that no agreement for a second marriage had ever been made. For example, as the recipient of massive transfers of funds during the post-divorce years, Cynthia was concerned over her tax liability, and her trial exhibits show the efforts she made to assure herself that Frank had paid gift taxes arising due to his monetary transfers to her.[6] [See records from Cynthia's CPA, Phil Stephenson, at RR 23: PX 28, pdf 175, 183, 190-195]

At trial, both testifying experts (Gerhardt for Cynthia and O'Connor for Frank) testified that there is no tax impact on transfers between spouses, and therefore, there would have been no tax impact on the money transfers **if** Cynthia and

---

[6] Even though Cynthia is a licensed Texas attorney, a member of the Wharton Bar Association and up to date on her CLE, she tried to portray herself as lacking legal skills and without any knowledge of ordinary business, tax, and legal matters at various times during trial. [See, *e.g.,* RR 2: 347; RR 3: 18-21, 72-77] However, her portrayals are belied by her testimony and documentary evidence (letters to Frank) in which she writes of expecting payment on a family law case that had concluded, her work arising from court appointments, her application to teach at South Texas College of Law, her work in the Hague during the preceding 15 years, her description of her employment as a "Fee Attorney for United Nations" on her application for the Kelving Way loan, and her comparisons of California and Texas taxes. [RR 22: RX 20; RR 8: PX 32; RR 3: 44, 55; RR 5: 12, 64, 65-66]

Frank had been married. [RR 2: 276; RR 4: 113-14] Thus, had there been an agreement to be married and an informal marriage, neither Cynthia nor her CPA would have been concerned about taxes because she and her CPA would have known there would be no tax consequences for Cynthia's receipt of money from Frank. [RR 23: PX 28 at pdf 175, 183, 190-195]

Also, had there truly been any agreement to be married, Cynthia would not have consented to or signed off as "head of household" on her federal income tax returns, as "unmarried" on her loan application, and as "single" on the deed to her home. The loan application for Cynthia's Kelving Way home was signed by Cynthia, alone, as "unmarried." In executing the document, Cynthia acknowledged that her "unmarried" representation was true and correct, and that "any intentional or negligent misrepresentations of this information contained in this application may result in civil liability, including monetary damages . . . and/or criminal penalties, including but not limited to fines or imprisonment." [RR 22: RX 20, p. 1, 3] Cynthia's forthright assertions of marital status in a document that carried with it the consequence of liability for false statements is highly probative evidence that Cynthia knew there was no marriage and that she and Frank had not agreed to remarry. *See, e.g., Russell v. Russell,* 865 S.W.2d at 932 (where the Court discussed assertions as to marital status in the context of potential liability).

11

Likewise, Frank's federal tax returns showed his marital status as "single," and on the gift tax schedules he listed Cynthia, the recipient, as "ex-spouse." [RR 22: RX-11 through RX-19; RR 22: RX-1 through RX-8] The Francis W. Sinatra Trust (Dated June 15, 1998) Restated September 20, 2005, states that Frank, the settlor, is not married. The section providing for distributions at time of his death lists Cynthia as "my former wife." [RX-45, p. 5 ¶ 1.3, p. 11 ¶ 5.3(a)(1)] Where both Cynthia and Frank made "single" and/or "unmarried" representations of marital status in federal tax returns, a trust document, and loan application, the objective evidence shows that both parties clearly knew and understood that they had not agreed to remarry and were no longer married.

In those cases where courts found sufficient evidence of an agreement to be married, there was also objective evidence to support the finding of agreement, such as jointly filed federal tax returns, signing off on legal documents as married, and referring to an existing state of marriage. *See, e.g., Lewis v. Anderson,* 173 S.W.3d 556, 559 (Tex. App.–Dallas 2005, pet. denied); *Hart v. Webster,* 2006 WL 1707975, * 3 (Tex.App.–Austin 2006, no pet.). In our case there is no objective evidence to support a finding of agreement, and all objective evidence is contrary to any agreement.

As the fact-finder, the trial court was charged with the duty to make

12

reasonable decisions regarding the credibility of the party witnesses. The trial court was not free to disregard the evidence that was contrary to informal marriage, where both parties had declared their marital status as single. Under the authority of *City of Keller v. Wilson,* the court's unreasonable credibility and evidentiary determinations are not immune from review and should be reversed. *See generally City of Keller v. Wilson,* 168 S.W.3d at 810, 812, 813-14, 820.

> **2. Analysis of Cynthia's Claim of "Living Together in Texas as Husband and Wife" Contrasted with Cynthia's and Frank's Evidence Showing Frank has Always Lived in California**

The relevant time period for the purpose of reviewing the trial court's order of common law marriage is between the March 29, 2001 divorce and April 27, 2002. (The trial court ruled that the parties ". . . entered into an informal marriage on April 27, 2002." [CR 208-09])

> **a. Preponderance of Evidence Offered by Both Cynthia and Frank is Contrary to Court's Ruling** [7]

Frank testified he has lived in California all his life. [RR 3: 93] Cynthia admitted that Frank has always lived in California, and specified: "Mr. Sinatra has never lived outside of 90210." [RR 3: 54-55] At the risk of belaboring the obvious, Frank again contends he could not have created a permanent and

---

[7] In addition to the supplemental argument contained in this Reply, Frank refers the court to his Appellant's Brief, pp. 25-29.

immediate marriage relationship in the State of Texas and lived in Texas as Cynthia's husband when he always lived in California.

Frank left Texas after the March 29, 2001 divorce hearing, and he did not visit Cynthia in Texas until eight months later, when he traveled to Wharton for the Christmas holiday in December 2001. [RR 2: 328; RR 3: 15-16] In briefing, Cynthia incorrectly claims that after the divorce, Frank, Cynthia and her daughters remained together in California until they all returned together to Wharton in September 2001. (Appellee's Brief, p. 8) In fact, Cynthia herself testified that she stayed at Frank's home during the spring so her daughters could finish the school year; she went to the Hague in the summer of 2001; and the girls went to summer camp. [RR 3: 314, 317; see also RR 8: RX-1 at App. 1, p. 9]

In addition to Frank's Christmas visit with the family, Cynthia also testified to two other visits that occurred prior to April 27, 2002. [RR 2: 329-30, with Cynthia's testimony incorporating 'visit' language, and not 'coming back home.'] These three visits during the year from March 29, 2001 - April 27, 2002 should not be viewed as "living together in Texas as husband and wife" and establishing a permanent marital relationship in Texas where at all times Frank was living in California, and Cynthia admitted that vital fact.

There is no dispute that the parties' sexual relationship continued

14

after divorce. The dispute is whether the fact of "sharing a bed" during three visits to Texas can support a finding of "living together in Texas as husband and wife." Cynthia's argument and the court's ruling illustrate the problem presented by non-marital sexual relationships in modern society. The fact that a man and woman engage in a sexual relationship should not mean that they lived together as husband and wife. The Texas Supreme Court has noted the difficulty presented by non-marital cohabitation in the context of reviewing evidence for tacit agreements, and the reasoning should be equally applicable to this case where the court found "living together as husband and wife" based on a non-marital sexual relationship. *See Russell v. Russell,* 865 S.W.2d at 932 (changes in modern society and non-marital cohabitation called for more careful weighing and analysis of evidence); *see also Thomas v. Sun Life Assurance Co.,* 2010 WL 2991116 at * 3.

### b. Additional rebuttal on Cynthia's claims of living together

Frank specifically disputes Cynthia's claim that his post-divorce financial support was additional evidence of informal marriage. (Appellee's Brief, p. 40) In fact, Cynthia testified that Frank had provided her with financial support since 1992, six years prior to their marriage. [RR 2: 321, 339; RR 3: 37-38] Following the 2001 divorce, Frank paid Cynthia lump sums and monthly spousal payments, per the decree. [RR 8: PX-1, p. 2 ¶ 8, App. 1 at p. 8, ¶ 6.2 (A. and B.)]

After that he continued to meet her demands for money, until such time as he could not. (See Appellant's Brief, pp. 6-10; RR 25: RX-52) Frank's financial support was not evidence of an informal marriage, but it was the constant factor from 1992 forward in his keeping company with Cynthia, where Frank had been paying Cynthia before marriage, during marriage, and after marriage.

In briefing, Cynthia would have the Court believe that she and Frank were in constant communication and lived together as husband and wife at all times permitted by schedules, whether in Texas or California and when traveling. (Appellee's Brief, pp. 10, 16, 31, 39) However, Cynthia herself presented evidence that is contrary to her marriage claim and the court's ruling, for example:

- PX-29 in which Cynthia acknowledged she was not traveling with Frank; she was disappointed in the relationship; she was excluded from important moments in his life;

- PX-30 in which Cynthia wrote to Frank with requests for money, and acknowledged his life had moved on;

- PX-32 in which Cynthia acknowledged that they had not spoken in over a month; Leslie and Josie are a giant part of Frank's life; he pays for them to live across the hill from him; he jumps to assist them; life has moved on; asking Frank to let her move into his home in California;

- RR 5: 51-2 where Cynthia testified that Frank didn't spend as much time with her; he spent time with Leslie and Josie; he wanted to raise Josie;

16

- RX-38 in which Cynthia acknowledged that it would be 'some little time' before he would want to see her; she invited him to come for a visit when it was convenient;

- RX-36 in which Cynthia wrote Frank, telling him to go on with his life, live his life, enjoy his money and his home, she would be moved by May 1, signing off Not your weapons any more.

Contrary to Cynthia's assertion that the "marriage" was marked by constant togetherness and communication, Cynthia's letters to Frank and her testimony established the following facts: Frank's life was focused on Leslie and Josie in California; Frank wanted to raise Josie in California; Frank was paying for a home across the hill so that Leslie and Josie could be near his home; Cynthia was not living with Frank but made requests for Frank to visit her in Texas and to allow her to move in with him in California; Cynthia admitted she was not included in important moments in Frank's life; they did not see each or speak with each other for extended periods of time; Cynthia admitted that 'life was moving on.' Cynthia's claim that she and Frank entered into an informal marriage in 2001 is defeated by her own evidence as well as evidence presented by Frank.

## II. Reply and Additional Argument on Issue Two and Issue Three
[*Relating to Court's Ruling on Frank's Hensal Road home and $500,000 equalization judgment*]

Because Frank believes that no informal marriage ever existed, he continues to maintain that no community estate could have been accumulated which would be

17

subject to division.  Nonetheless, Frank offers the following short supplement and

rebuttal on the Hensal Road arguments presented in Cynthia's brief.

**A.  Frank met his burden of proof to show that the Hensal Road home was his separate property.**

The trial court awarded Cynthia an undivided 50% community interest

in  the Hensal Road home. [CR 196] However, Frank has contended the evidence

shows the home was purchased by the Francis W. Sinatra Trust and was paid for with

separate property funds that had been deposited into the trust's bank account.[8]

- Frank inherited separate property assets from his father, Frank Sr.  Frank Sinatra Sr.'s estate included the Somerset Trust.  Entities called Bristol, Essex, and Sheffield were part of the Somerset trust. These entities held reprised masters, movies, the Capitol Records catalog, intellectual properties in name and likeness.  [RR 5: 92-3, 97-8] The assets had been earned by Frank Sinatra Sr. and the Somerset Trust had been set up by him to provide for his heirs upon his death. The owners of Bristol, Essex, and Sheffield were Frank, his two sisters, three then-living grandchildren, and two business associates.

- Tracing  Bristol, Essex, and Sheffield assets into new entities. In 2007, the Bristol, Essex, and Sheffield entities were folded over into an entity called FSE Holdco.  [RR 5: 103; RX-49; RX-50] FSE Holdco then contributed a portion of its assets (all of the masters, likenesses, and TV shows) into another new entity named Frank Sinatra Enterprises (referred to as FSE). [RR 5: 97-99; RX-43; RX-49, RX-50] The owners of these two new entities (FSE Holdco and Frank Sinatra Enterprises) remain as they had been under Bristol, Essex, and Sheffield. [RR 5: 100-103]

---

[8]      There is no dispute that Frank's trust was created in 1998, following his father's death and prior to his ceremonial marriage to Cynthia. [RR 24: RX-45]

- The "Holdco Transaction." As part of the creation of the new FSE Holdco entity and the Frank Sinatra Enterprises (FSE) entity, 50% of the assets held by Frank Sinatra Enterprises (FSE) were sold to Warner Music. [9] The closing date on the asset sale was November 19, 2007. Frank's share of the proceeds was reported on his 2007 tax return as $12,367,795. [RR 22 at RX-15, p. 1; RR 5: 103]

- Frank's share of the proceeds was deposited into his Frank W. Sinatra Trust bank account. Frank realized proceeds from the asset sale in the amount of $10.1 million. That amount went directly into his trust's bank account on November 19, 2007. [RR 5: 103, 112-13; RR 6: 32-33]

- Purchase of Hensal Road property. One month later, on December 21, 2007, the Francis W. Sinatra Trust closed on the purchase of 9706 Hensal Road. The home cost $4.1 million and all funds came from the trust's bank account, which was the same bank account that had received the November 19, 2007 deposit of Frank's share of proceeds from the asset sale to Warner Music. [RR 5: 102-103, 112-13; RR 27: RX-77] The closing statement identified the buyer as the Francis W. Sinatra Trust, dated June 15, 1998, and the Grant Deed lists the grantee as Francis Wayne Sinatra, Trustee of the Francis W. Sinatra Trust, dated June 15, 1998. [RR 24: RX-41, RX-43; RR 27: RX-77]

Frank's evidence on the inception of his right to the separate property assets and tracing those assets through mutations and exchanges met Texas' standards for proving his separate property claims by clear and convincing evidence. *See, e.g., Boyd v. Boyd,* 131 S.W.3d 605, 612 (Tex.App.–Fort Worth 2004, no pet.); *Zagorski v. Zagorski,* 116 S.W.3d 309, 316 (Tex.App.–Houston [14th Dist.] 2003, pet. denied).

At the time of the November 19, 2007 Holdco Transactions and the December

[9] The contribution agreements and operating agreements were produced to Cynthia and were admitted as exhibits at trial. [See RX-48, 49, 50, 69, 70, 71, 79]

21, 2007 purchase of the home on Hensal Road, the bank account that had received the proceeds from the asset sale to Warner Music and then paid for the Hensal Road home did not have any funds that could be deemed community property. There could have been no commingling when all monies that could have been community property had been paid to Cynthia. Working from Frank's tax returns, Randal O'Connor prepared Exhibit 52, a summary of all income which would be considered community if the parties had been married. (Capital gain was excluded as separate property.) [RR 5: 102, 105-108] In the column for the year 2007, the summary shows that Frank had transferred all "community" income to Cynthia; the community column reflected a negative, and Frank was paying Cynthia out of his separate property. [RR: 25: RX-52]

Although the trial court seemed to find that Frank's separate property became community property when it was deposited into his trust's bank account, our law does not require that result when the exact amount of separate property funds can be traced into, and then out of, a bank account. *See Welder v. Welder,* 794 S.W.2d 420, 425 (Tex.App.–Corpus Christi 1990, no writ); *Zagorski v. Zagorski,* 116 S.W.3d at 319, 20; *In the Matter of the Marriage of Tandy,* 532 S.W.2d 714, 717 (Tex.Civ.App.–Amarillo 1976 , no writ).

In addition to the exhibits cited above, Frank relied on the testimony of

20

Randal O'Connor, CPA, whose firm has handled Frank's and the family's financial affairs for many years. O'Connor also handles payment of taxes and pays bills for Frank. Frank does not have a personal bank account, and O'Connor writes all checks and manages two bank accounts for Frank.[10] In his role of financial manager and overseer of Frank's affairs, O'Connor participated in the Holdco and subsequent Hensal Road transactions. [RR 2: 272-73; 294-95; RR 5: 95-97, 117] Even without the wire transfers, O'Connor presented competent evidence on deposits and expenditures from the trust's bank account. *See Moroch v. Collins,* 174 S.W.3d 849, 863 (Tex.App.–Dallas 2005, pet. denied); *Zagorski v. Zagorski,* 116 S.W.3d 309, 317 (Tex.App.–Houston [14th Dist.] 2004, pet. denied].

**B. The court abused its discretion when it allowed Cynthia to withdraw her stipulation that the Francis W. Sinatra Trust was separate property because the stipulation was binding and conclusive as to the fact conceded and Cynthia was estopped from claiming to the contrary.**

At the close of evidence and after O'Connor had left for California, Cynthia withdrew her stipulation that all items listed at lines 78 - 102 were Frank's separate property. She requested the court to allow her to withdraw her stipulation on line 85 which itemized the Francis W. Sinatra Trust. [Cynthia's inventory, PX-

---

[10]    Frank does not have access to a personal bank account. He has cash that Randy sends him weekly. He has credit cards. [RR 6: 19] The summaries of the flow through entity Anomaly were in evidence. [RR 25: RX-53 to 54]

21

100; RR 6: 39-41] Cynthia's counsel also attempted to except lines 78 and 80 from the stipulation on separate property. Cynthia further argued that Frank had failed to prove the separate nature of the trust deposits into the account which were then commingled.[11] Frank objected to Cynthia's request as reopening evidence and also noted that the case had been tried under the stipulation and O'Connor was no longer present. [RR 6: 40; see also RR 5: 134] In *Gulf Coast Construction Co. v. Self,* 676 S.W.2d 624, 631 (Tex.App.–Corpus Christi 1984, writ ref'd n.r.e.), the appellants in that case argued that the appellees had failed to prove up a basic portion of their proof. This Court overruled the point, explaining that the appellants were ignoring the stipulations agreed upon by the parties. *Id.* Likewise, Cynthia and the trial court totally ignored the stipulations in this case.

In the course of argument, the trial court offered its conclusion that "Somerset, Bristol and some of the others retain their separate character because they all went into FSE Holdco. I don't recall hearing any testimony that any of those

---

[11] In briefing, Cynthia incorrectly states that O'Connor admitted he could not trace the funds from the trust to the house. (Appellee's Brief, p. 54] O'Connor testified at length about the transaction, including the deposit into the account and purchase payments out of the account. (Cites and argument at pp. 18-21, *supra*.) On cross-examination, O'Connor reiterated the payments from the trust. [RR 5: 130-31] Cynthia also incorrectly alleges that O'Connor conceded $129,000 had been paid by Frank individually. (Appellee's Brief, p. 56) In fact, O'Connor stated it was the trust and had previously testified that Frank did not have a personal checking account. As to an itemized tracing for the entire account, O'Connor testified he could do it, it would take time, and he could give no testimony on that day. [RR 5: 132] The exercise would have been expensive, and unnecessary under the trial stipulation as well as previous stipulations.

wound up in the trust."[12] [RR 6: 42] The issue narrowed to whether the trial court would allow Cynthia to withdraw her stipulation as to the entire Francis W. Sinatra Trust, which owned Hensal Road, or whether the court would limit the withdrawal to the monies that went in and out of the trust's bank account. When it became clear that the court would allow Cynthia to withdraw her stipulation as to all of the Francis W. Sinatra Trust, Frank sought to limit the extent of the withdrawal by accepting the description of "bank account" and "monies that have come in and out." [RR 6: 40-44] Counsel's statement that the limitation to the bank account was 'perfect,' should not be viewed as waiver of objection where counsel was arguing against the even more onerous alternative as to the entire trust and its assets.

In fact, the court allowed Cynthia to withdraw her stipulation as to the entirety of the Francis W. Sinatra Trust which owned Hensal Road. The decision violated well-settled law on the conclusive effect of stipulations as to the matters conceded. *See Bomar Oil and Gas, Inc. v. Loyd,* 381 S.W.3d 689, 693 (Tex. App.–Amarillo 2012, pet. denied)(stipulation serves as proof on an issue that otherwise would be tried and parties are thereafter estopped from claiming to the contrary). Although Cynthia argues that Frank did not meet his burden of proof as

---

[12]     As noted above in ¶ II. A., Randal O'Connor testified to the sale of the assets that the court had acknowledged were separate property and the proceeds from the sale were deposited into the Francis W. Sinatra Trust bank account.

23

to the Hensal Road home which was owned by Frank's trust, her stipulation had conceded the separate characterization of the trust. When Cynthia was incorrectly allowed to withdraw her stipulation, the trial court proceeded to award Cynthia ½ of Hensal Road property. The trial court abused its discretion where its ruling was clearly prejudicial and deviated from guiding rules and principles governing the binding nature of stipulations.

**C.** **Frank disputes Cynthia's arguments regarding the state of discovery, Charles Gerhardt's testimony and the inventory prepared by him.**

Cynthia's complaints that Frank did not produce documents that she needed and that violated rules of discovery are without merit. Frank's approach to the discovery process had been open and transparent, as illustrated by letters and emails sent by Frank's counsel to Cynthia's counsel and expert witness, Charles Gerhardt, to wit:

- On the same day that Cynthia designated her expert witness, March 5, 2014, Frank's counsel wrote to Cynthia's counsel with the suggestion for a conference call with the attorneys, Gerhardt and O'Connor, and with the additional suggestion that Gerhardt communicate directly with O'Connor to expedite the process. [RR 9: PX-A, attached hereto] Gerhardt emailed that he would contact O'Connor. [PX-B] Gerhardt never contacted O'Connor. [RR 4: 95-6; RR 5: 88]

- Gerhardt received a thumb drive from Frank's counsel which contained 3,000 documents; he also received Frank's tax returns for the years 2003 through 2012. [RR 4: 43]

24

- On April 22, 2014, Gerhardt received a copy of Frank's preliminary inventory with its notations on proof of the various entities and identification of Bates-stamped documentation, together with another invitation to discuss any questions with Frank's counsel or paralegal. [PX-C] A comparison of the preliminary inventory with Frank's trial inventory [RR 26: RX-72]shows revisions only to the lowered amount of mortgage, Frank no longer owned the Lexus automobile, and Frank listed the promissory note to his sister.

- On May 29, 2014, Frank provided Gerhardt with a copy of the summary showing income that could be deemed community under marriage and monies paid to Cynthia which had been prepared from Frank's tax returns. [PX-D]

In addition to tax returns, Frank also produced all contribution agreements, operating agreements, trust and partnership agreements, settlement statements, and real property documents, which are contained in the record as trial exhibits.[RR 24: RX-41 to 50; RR 25: RX-55 to 59; RR 26: RX-60 to 71; RR 27: RX-77 to 82]

In contrast, Cynthia did not produce an inventory until May 30, 2014, the Friday before trial. While Frank had known the identity of Charles Gerhardt and had offered to conference with him and answer any questions, no conference took place. Frank never received any expert report from Gerhardt showing the subject matter, the substance of his mental impressions and opinions, and the basis for them. Frank filed a motion to strike the expert, which was denied. [CR 170-172; RR 4: 25, 28] [13]

Frank made his objections at trial, all of which were overruled. [RR 4: 9, 26-7, 28, 37,

---

[13] Cynthia's counsel offered a continuance so that Gerhardt could be deposed, but as a practical matter, Frank had been forced to borrow money from his sister to pay temporary support and the "bleeding" on the case kept on. His counsel noted a continuance would punish him. [RR 4: 15, 24]

25

52, 54, 60]

Frank was not provided with any calculations or methodology by which Gerhardt arrived at nearly $2million which was allegedly owed to Cynthia. [RR 4: 17, 25-27] During Gerhardt's testimony, it became apparent that many of his conclusions on the character of property and the valuation to be placed on Cynthia's claims against a community estate were based on numerous erroneous assumptions, projections, and mathematical mistakes. By way of example, and without listing all of the errors, Frank points out the following:

- Gerhardt characterized FSE as separate property, but he characterized FSE Holdco as community property, testifying it had been formed during the marriage and he did not consider the entities that were folded into the new holding companies. [PX-100, line 31; RR 4: 60, 118-19]

- He characterized FWS Realty Delaware, LLC as community property [PX-100, line 32]. Cynthia's counsel later corrected that mistake and admitted that FWS Realty Delaware should be Dorchester and was Frank's separate property. [RR 4: 121]

- Gerhardt itemized one community property claim against Frank's separate property based on losses which allegedly arose from Anomaly. [PX-100, line 118] He testified that Frank was losing money on his music business, that it created a negative cash flow and concluded that his singing business was a hobby. [RR 4: 63, 125]

- Gerhardt calculated the losses arising from Anomaly by taking a monthly cost between $11,845 and $18,508/month and carried it out for 144 months of marriage. [PX-100, lines 118-19] On cross-examination it was pointed out that his 144 months projection was incorrect since Anomaly had not existed until 2005. [RR 4: 130-31]

26

- Gerhardt calculated that the community estate lost income when separate property was moved into FSE in 2007. [PX-100, line 122] As part of Cynthia's claim he calculated the lost income as $127,469 for 6.5 years and arrived at a total: $1,413,548. During cross-examination it was pointed out the mathematics were incorrect; the total should have been listed as $838,548; Gerhardt admitted the mistake but said it didn't matter. [RR 4: 105]

- Gerhardt prepared PX-100A from tax returns and referred to it when analyzing the 2007 Holdco transaction (described at ¶ II. A., *supra*). Gerhardt referred to line 96, column H, which listed the 2007 capital gain of $12,408,035. Gerhardt testified that none of the capital gain/cash was distributed except for income taxes, further opining that the capital gain had been retained by Holdco. [RR 4: 57] Of course, there is no evidence in the record to support this theory, and Gerhardt failed to prepare a report explaining his mental impressions, opinion, and the basis for this conclusion.

The trial court spoke to Frank's counsel: " . . . And it might be interesting for you to know what I'm wondering about. . . . you really can't tell where the cash is." [RR 4: 126-27] Then Gerhardt reiterated once again: "They make a cash distribution for taxes only but they don't distribute anything else." [RR 4: 127]

Regardless of the baseless opinions, assumptions, and untrustworthy calculations shown in Gerhardt's inventory, the trial court elected to find Gerhardt a credible witness. The court's credibility determination is unreasonable and required the court to disregard and ignore clear, positive, and direct evidence presented by Frank, O'Connor, and as contained in the transactional documents, tax returns, and summaries. A fact-finder is not free to believe testimony that is conclusively negated. *See City of Keller v. Wilson*, 168 S.W.3d at 820, 827 ("While there is some dispute

27

whether Lady Justice should wear a blindfold, the metaphor was surely never intended to suggest that justice disregards the facts.") The court found that "Francis Wayne Sinatra has possession and control of unspent cash and earnings paid to him during the informal marriage and deposited in bank accounts in the name of the Francis W. Sinatra not revealed or identified during the trial in the amount of at least $1,000,000." [CR 224-25, Finding No. 13] The court's determination of Gerhardt's credibility was not reasonable, but nonetheless it led to the unsupported finding and rendition of the erroneous money judgment for $500,000.

WHEREFORE, PREMISES CONSIDERED, Appellant FRANCIS W. SINATRA respectfully requests the Honorable Court to sustain his issue on common law marriage, and to thereafter issue its opinion and render judgment that Appellant and Appellee did not enter into an informal marriage; therefore, there was no community property to divide. In the event the Court finds a marriage existed, Appellant requests the Court to sustain his remaining issues, confirm his separate property, vacate the Final Decree of Divorce, and remand for entry of a decree in conformity with the Honorable Court's opinion. Appellant requests such other and further relief to which he may be entitled, both at law and in equity, and for which he will ever pray.

Respectfully submitted,

**JENKINS & KAMIN, L.L.P.**
TWO GREENWAY PLAZA, STE. 600
HOUSTON, TX 77046
TEL:  713-600-5500
FAX:  713-600-5501
lstanton@jenkinskamin.com(non-service)
jenkinskaminservice@jenkinskamin.com
(e-service)

*/s/ Lynn Kuriger Stanton*
*By:*_____
      Lynn Kuriger Stanton
      State Bar No. 11767600


**LAW OFFICE OF WARREN COLE**
3355 W. ALABAMA, STE.  825
HOUSTON, TX 77098
TEL: (713) 275-4444
FAX: (713) 400-9144
Email: warren@warcolelaw.com

*/s/Warren Cole*
By:_____
      Warren Cole
      State Bar No.  04549500


**ATTORNEYS FOR FRANCIS W.  SINATRA**

## CERTIFICATE OF COMPLIANCE

This brief complies with the form requirements, including word limits, as contained in Rule 9.4, Texas Rules of Appellate Procedure. The brief was prepared using Wordperfect X7. The Word Count function states that the brief contains 7,447 words, excluding the items which are not to be counted under Rule 9.4(i)(1).

*/s/ Lynn Kuriger Stanton*

_____

LYNN KURIGER STANTON

**CERTIFICATE OF SERVICE**

I certify that a true copy of the above Appellant's Reply Brief  was served on Robinson Ramsey and John Maher, who are appellate counsel and trial counsel for Cynthia Sinatra, via e-filing, on July 20, 2015.

ROBINSON C.  RAMSEY
LANGLEY & BANACK, INC.
Trinity Plaza II, Suite 900
745 E.  Mulberry
San Antonio, Texas 78212
rramsey@langleybanack.com

JOHN C.  MAHER, JR.
THE LAW OFFICE OF JOHN C.  MAHER, JR.
212 E.  Burleson Street
Wharton, Texas 77488
johncmaher@sbcglobal.net


*/s/ Lynn Kuriger Stanton*

_____
LYNN KURIGER STANTON
Attorney for Francis Wayne Sinatra

The APPENDIX contains the following book-marked items:


**A**     **Cynthia - Frank Correspondence**
        **[Petitioner's Exhibits 29 - 32; Respondent's Exhibits 36, 38]**


**B**     **Correspondence relating to discovery**
        **[Petitioner's Exhibits A, B, C, D]**

Petitioner's Exhibit No. 29
Letter from Weapons to F. Sinatra

# CYNTHIA SINATRA
## Attorney and Counselor at Law
2120 Welch Street
Houston, Texas 77019
(713) 225-8500
(713) 523-7887 FAX
cynthiasinatra@aol.com
Sinatralaw.com


PETITIONER'S EXHIBIT

29

August 31, 2009

Dear Francis,

I know that Jackson Hole is one of the most beautiful places on this earth. I have been there many times and had hoped that you would include me in special trips, such as this. I am glad that you enjoyed the trip and had the opportunity to inhale the Grand Tetons with your friends.

Yes, I am disappointed in our relationship. I am excluded from the important moments in your life. I was hoping that by now you would have realized that I am an asset to you and your organization and not a liability.

Please note that for months, I have had no credit on my credit card. I checked today. I have not used it. I have not other income, and you have promised that I would have $2800 credit each month for prescriptions and food. Please assure that by tomorrow, September 1, 2009, that I have the $2800 allotment. I am going to pay my electricity, water, prescriptions and food with that amount.

Thank you for promptly calling Matt and seeing that this is taken care of.

Always,

*C*

Weapons

Petitioner's Exhibit No. 30
Letter from Weapons to F. Sinatra

PETITIONER'S
EXHIBIT

30

## CONFIDENTIAL

### CYNTHIA SINATRA

Attorney and Counselor at Law
2120 Welch Street
Houston, Texas  77019
(713) 225-8500
(713) 523-7887 FAX
cynthiasinatra@aol.com
Sinatralaw.com
September 13, 2009

FF and Company
By Fax:  310-258-1507

Dear Francis,

I have just read through your memo to Matt, and I want you to know that I appreciate your fight to continue to protect us from harm.  I am cutting back as much as I can, and I am feeling positive about a job coming up in the near future.

In subsection b) you state that we have use of the Exxon card up to $200.  Is that $200 per person?  I know that all of three of our vehicles will not be able to be fueled at such rationing.  Is this a clerical mistake?

I am on my way to HEB to pick up $979.00 worth of prescriptions.  I need to have them with me this week, just in case this job begins immediately.

I just got my car out of Momentum day before yesterday.  It is running much better, now; however, they did put new brake pads on the front wheels.  I do not know how much the charges are.  Kevin let me pick up the car anyway.  I do not have the money to pay Momentum for the brake pads.  Please let me know how I can help with this.

I need to travel to The Hague.  I have used my airmiles, however, I cannot pay for the Bel Air Hotel with what is left and survive.  Would you be able to help me once I am there?

I miss my Francis.  I know that your life has moved on, and I will always care about you and love you.  Perhaps after I get a job, we can communicate like in old days, as friends.  My shame is too great to try to talk to you until I can answer your questions with something positive. I want to help.  I need to help.


Always,

Weapons

Petitioner's Exhibit No. 31
Letter from F. Sinatra
to My Darling Weapons

PETITIONER'S
EXHIBIT

31

MY DARLING WEAPONS,

WELL OVER A MONTH HAS PASSED NOW SINCE I LAST HEARD YOUR VOICE. IT HAS BEEN A LONG AND BITTERLY LONELY NUMBER OF DAYS THAT HAVE CAUSED MISERY AND LONLINESS. FOR A TIME, YOU AT LEAST SENT TEXT MESSAGES TO ME WHICH AT LEAST WERE SOME COMMUNICATION, BUT A BITTER SUBSTITUTE. I AM MOST UNHAPPY ABOUT YOUR ADDITUDE IN THIS MATTER BECAUSE I BELIEVE IT IS BENEETH YOU TO BEHAVE SO.

AS I HAVE TRIED TO TELL YOU, SINCE THE 4TH. WEEK OF MAY, I HAVE PROVIDED YOU WITH 5 TRIPS TO VARIOUS LOCATIONS. IF YOU ARE CURIOUS, I WILL TABULATE THE COSTS OF ALL OF THOSE VISITS ALONG WITH THEIR COLLATERAL EXPENSES. PERHAPS THE NUMBERS WOULD IMPRESS YOU AS TO HOW EXPENSIVE A PERIOD OF 3 MONTHS OF TRAVEL CAN BE IN THIS DAY AND AGE. I CHOSE NOT TO BRING YOU TO CALIFORNIA EARLIER THIS MONTH BECAUSE I HAD MY HANDS FULL WITH 7 HOUSE GUESTS ON A SLEEPING BASIS, AS WELL AS 12 TO 14 ON A DAILY BASIS. IT WOULD HAVE BEEN TOO MUCH TO BRING YOU HERE AT THAT TIME. I HAD ENOUGH DIFFICULTY JUST KEEPING RENEE FROM DRIVING EVERYBODY CRAZY.

SO NOW YOU RESPOND BY CUTTING OFF COMMUNICATION. I BELIEVE THAT THE PRIMARY REASON FOR YOUR ACTIONS IS MANIFEST. YOU DID NOT GET YOUR WAY. FOR YEARS NOW, I HAVE BEEN AWARE OF YOUR POSITION ON HAVING THINGS GO EXACTLY AS YOU WANT THEM TO, AND I KNOW THAT YOU MAINTAIN THE ADDITUDE; "NO ONE EVER SAYS NO TO ME"! THROUGHOUT THE YEARS WE HAVE BEEN TOGETHER, I HAVE TRIED NEVER TO SAY "NO" TO YOU; NOT BECAUSE YOU ALWAYS MUST HAVE THINGS YOUR OWN WAY, BUT RATHER BECAUSE I HAVE LOVED YOU SO MUCH THAT I ALWAYS WANTED YOU TO HAVE THINGS THE WAY THAT YOU WISHED THEM TO BE. I HAVE BROKEN MY BACK SO MANY TIMES TO KEEP THIS ORDER OF THINGS FOR YOU AND THE GIRLS IN EXACTLY THIS WAY.

BUT NOW THE TIME IS COME WHEN I CAN NO LONGER DO SUCH THINGS. PROFESSIONALLY AS WELL AS FINANCIALY, I AM FIGHTING FOR MY VERY LIFE.

WHEN WE WERE MARRIED, I PROVED MYSELF NOT TO BE THE HUSBAND YOU WANTED. NOT BY A LONG SHOT. AND EVEN TODAY, IT HURTS ME TO THINK OF HOW INADEQUATE I WAS. I MADE MY MIND UP AFTER OUR MARRIAGE FAILED THAT I WOULD AT LEAST BE STEADFAST AND COMPLETE IN ONE PROMISE I HAD MADE TO YOU. I ALWAYS TOLD YOU THAT HOWEVER GREAT OR HUMBLE, I WOULD ALWAYS "SHARE MY FORTUNE WITH YOU".
THIS, I HAVE FAITHFULLY CARRIED OUT WITHOUT A FAILURE, OR A HESITATION. I PROMISED TO TAKE CARE OF YOU AND THE GIRLS. I HAVE KEPT MY PROMISE IN SHARING WITH YOU, ALL OF MY RESOURCES.

BUT ONE THING I NEVER PROMISED YOU WAS…"EVERYTHING". IF I PERMIT THINGS TO CONTINUE THE WAY THEY HAVE BEEN FOR THE PAST 17 YEARS, THAT IS EXACTLY WHAT YOU WILL HAVE ENDED UP TAKING FROM ME… EVERYTHING! THIS IS WHY I HAVE BEGGED YOU TO GO BACK TO WORK, SO THAT SOME OF THE HEAT WILL BE REMOVED FROM MY PICTURE BEFORE I GO BROKE.

THERE IS NO REASON FOR ME TO LIST AGAIN THE DETAILS OF MY MASSIVE CONTRIBUTIONS TO BOTH YOU AND THE GIRLS THROUGH ALL OF THE YEARS, BECAUSE YOU KNOW THEM SO WELL. I SENT A LIST TO MRS.HENSLEY OF ALL THE RESPONSIBILITIES THAT I WILL CONTINUE TO ASSUME IN THE FUTURE. OBVIOUSLY SHE SHOWED IT TO YOU, AND THEN YOU SEND A TEXT SCOLDING ME FOR SENDING IT TO HER AND NOT TO YOU. YOU ARE THE ONE WHO HAD BROKEN OFF COMMUNICATION.

IN ONE INSTANCE, YOU PROMISE THAT YOU WILL GO BACK TO WORK IN ORDER TO HELP TAKE THE BURDEN OFF ME. I RENT FOR YOU ONE OFFICE, AND THEN ANOTHER. NEITHER ONE YOU USE FOR THE PRACICE OF LAW. IN ANOTHER INSTANCE, YOU BECOME ANGRY AT ME AND TELL ME THAT IF I WASN'T SUPPORTING JOCIE, I WOULD STILL BE ABLE TO PAY ALL OF YOUR BILLS AND THE LIKE. MY SUPPORT OF YOU AND THE GIRLS IN THIS TIME PERIOD REMAINS NEARLY $10,000.000 PER MONTH. I DON'T UNDERSTAND WHY YOU WILL NOT ACCEPT THIS AS A BASIS FOR YOUR FINANCIAL LIFE, AND PICK UP THE REST OF THE COSTS BY WORKING.

THE FACT IS THAT YOU HAVE NOT KEPT YOUR PROMISE TO ME. I WAS HOPING THAT YOU WOULD SHOW ME THIS AS AN INDICATOR OF GOOD FAITH SO THAT WE CAN CONTINUE ON TOGETHER. I HAVE THOUGHT ABOUT IT FOR SO LONG NOW, AND I STILL DON'T THINK THAT I AM ASKING TOO MUCH FOR OUR RELATIONSHIP AS WE GO ON INTO THE FUTURE.

I KNOW THAT THIS LETTER WILL BE AN UNPLEASANT EXPERIENCE FOR YOU TO READ, BUT I WANT TO ALSO ADD THAT I WANT US TO HAVE A FUTURE TOGETHER THAT WE CAN BOTH LIVE WITH. ALL I'M ASKING FOR IS YOUR HELP, AS YOU HAVE PROMISED. HOWEVER, BECAUSE I DIDN'T BRING YOU TO CALIFORNIA THIS MONTH, YOU ARE NOW TELLING YOUR MOTHER, "FRANK'S NOT IN LOVE WITH ME ANY MORE'! YOU KNOW VERY WELL THAT THIS IS NOT TRUE. I CANNOT SWITCH MY LOVE FOR YOU ON AND OFF LIKE A LIGHT SWITCH. TO ME, YOU ARE STILL MY BEAUTIFUL GIRL... MY PRIZED "WEAPONS".

THE TRUTH OF THE MATTER IS THAT I'M NOT EVEN ASKING YOU TO "MEET ME HALF-WAY". I ONLY ASK YOU TO MEET ME A THIRD OF THE WAY, AS I AM CARRYING THE BULK OF YOUR LIVING EXPENSES. PLEASE WEAPONS!

I STILL LOVE YOU MY DARLING, AND MISS YOU BITTERLY. I CANNOT CONCIEVE OF NOT HOLDING YOU AT NIGHT AND DOING THE THINGS THAT WE ALWAYS DO TOGETHER. THE HOLIDAYS ARE COMING AND WE HAVE ALWAYS SPENT THEM TOGETHER. I DON'T WANT THIS YEAR TO BE DIFFERENT THAN THE PAST ONES. BUT YOU ARE NOT TALKING TO ME, SO THERE IS NO WAY I CAN CONSIDER THAT YOU WISH TO MAKE PLANS FOR THANKSGIVING AND CHRISTMAS.

IS THIS THE WAY YOU WANT IT TO BE?

PLEASE ADVISE. I MISS YOU AND I LOVE YOU VERY MUCH.

YOUR LONESOME AND VERY UNHAPPY francis.

(September 29,2009/16:00hrs PDT message ends)

Petitioner's Exhibit No. 32
Letter from Weapons to F. Sinatra

# CYNTHIA SINATRA

Attorney and Counselor at Law

2120 Welch Street

Houston, Texas 77019

(713) 225-8500

(713) 523-7887 FAX

cynthiasinatra@aol.com

Sinatralaw.com

Thursday, October 1, 2009



PETITIONER'S EXHIBIT

32

My sweet Francis,

It has been well over a month since we spoke.

I do not want to cause you misery. I, too, am lonely for the life with Fatty Francis that I once shared, and the dreams of the life with Fatty Francis that have evaporated.

All I hear from you each time that we did speak is get a job. After you were finished with the berating and the belittling, the only topic you shared was a one-sided conversation with me that is and remains too painful to engage in, again. The love of your life is Princess Jocie. When you have lunch and dinner with Princess Jocie, it necessarily translates into "You have lunch and dinner with Jocie and Leslie". I wish that I didn't care then that the knife in my heart wouldn't be turning each time you talk with such affection about this giant part of your life.

I have begged you for years now, just to give me the same opportunities and privileges that Leslie gets. You pay for her to live right over the hill from you which is geographically desirable. She can call, and you will jump to assist her in any little crisis. I wanted to be able to share my life with my Francis, but life has moved on. My Francis has a life that he is comfortable in, and I am not part of it.

Your letter yesterday further proves to me how little faith you have in me, and what your true feelings are about my personality and the person that I am in your eyes. You have taken a conglomeration of hurts, pains and disappointments and made them look petty. The only reason in your mind that we are not communicating is because I am so selfish and that I just plain didn't

1

get my way. How convenient it is for you to forget how wonderful our times have been together for the past five years. How happy we were together. All of your focus is on my behavior. Well, I live with secrets that none of your other family and friends shares. I am the one who lives through the pain of each moment of cheating on me throughout the years. I live through each day remembering that the woman who slept on my side of the bed in your arms shares your days and evenings with you, still.

I do not want everything. Thank you for the assurances that you sent to Mary Ann Hensley listing the items that you would continue to cover in my monthly expenses. I am not the one who broke off communications. Your last text said that it would be the final. That was over a month ago.

I am accepting the new financial rules that you have mandated. I have been trying to find a job, but I have had to spend whatever little savings that I had to continue looking and to cover the ongoing expenses of living in my home. It won't be long before I am over extended and without any funds. My mother doesn't have the money to help me. I am trying to arrange for a different energy provider. The electricity has gone from $400 to $1200. All of the homes in this area have suffered the same fate. I am fighting with them now, but I cannot exist without electricity during this time of the year.

I didn't spend the entire $2800 that we agreed would be on my credit card this (September) month, but with the $600 left, I am waiting for the office to pay the allotted $2800 which should give me $3400 to pay bills and get medications. Please make sure that just because I was trying to save the money from last month, that it is added to the credit on the card with the $2800 for this month. I am going to market with my mother to try to buy some Christmas presents wholesale.

You really don't know how I have cut back. I have been getting myself further and further in debt, not spending all of the credit that you have allowed me, and trying to cut back in lieu of being able to add money from the practice of law here.

I won the family law case that I was in, however there is still $1000 outstanding on her payment to me. I have no other paying cases at the moment, but I will be back in the office taking court appointments next week. I will be making something, but please make sure that the monthly allotment on my credit card gets paid. I have a grandchild and children that I would like to provide our

2

Christmas magic to. Christmas is my magical time of the year. I want to create that magic for this generation, too. I miss sharing that Christmas magic with you. My family and my children miss you, too.

I do not know how to put the pieces back together. Our relationship has been so bankrupt, cruel and painful for so long. It is hard for me to remember when you once held me under your right arm, read to me, kissed me, brushed or stroked my hair. Where did the tenderness of our love go?

I miss you each and every day. I do not feel that you love me any longer. We have discussed the many issues until I am blue in the face. I am not angry about the new developments in your life. I just want to be able to share them from our common understanding  I have poured my heart out to you over and over about my depression and disappointment of the results of out 17 years together. By this time, I had always imagined that we would be together. This panic about expenses would be one less anxiety in our lives. We have always loved each other. It is time to love each other enough to trust each other, or go on our way. The only solution that I see is that you would take me into your home. Let me contribute by caring and sharing our home with you. I love to cook. I would like to be able to complete the womanly tasks of a wife daily in your life.

I do not want life to be this way. You spend a lot of money to keep me living far away from you. The separation by this distance prevents the luxury I would have of running to meet you at the camera shop, or running some of your errands for you, or buying the groceries, or sharing our lives over a candle that we light in the kitchen as we have a quiet dinner for two at home. I could have worth and value in your life if you would just give me the opportunity. Other than the financial support that you pay to keep me far away and out of your life, what is your solution?

We are decorating for Halloween this weekend. The girls are coming home. Please take this knife out of my heart. Let me share your life with you. I miss my husband, my friend, my heartbeat.

I don't know how to respond to your letter. I miss you and I love you. You will always be my Francis, and I will always hold you dear in my heart. I am lonesome for your companionship. Please invite me to come see you as soon as possible. If you let me come into your life, perhaps we can be sharing Halloween here by the end of the month, however, I do not ever go where I am not invited.

3

I guess it is up to you.

This is not the way I want it to be.

Your confused, lonesome for Francis,

*Your Weapons*

Weapons

Respondent's Exhibit No. 36
C. Sinatra Letter



EXHIBIT
**R 36**

My Fatty Francis,

This is not about money.

Go on with your life (or as we always discussed "life after Weapons").

I can look back through all of the letters that I have written to you. I have loved you, been there for you, slept by your hospital bed, and protected you from irate band members, explaining your unexplainable behavior to all of our friends and family. I very lovingly changed your urine bags, forgave you for all of your cheating and knew in the back of my mind that when my bloom of youth was used up you would abandon me.

I did not choose to lose my health, recently. I have always been healthy and sure that I could take care of my family and myself. The situation has changed. I do not have the energy that I possessed before my health problems.

This is not about you losing all of your money. I would have happily shared the rest of our lives together, but when I was standing at the desk at the doctor's office and you refused to help me when I was down (kicked the sick dog), my life changed. This was not about plants or shopping or getting my hair done...this was my life.

I was not as shocked when you told me about Leslie and Josie as was when you left me standing at the doctor's desk when I am old and sick. Besides being physically ill, I am emotionally destroyed. Thank you.

I am still not well enough to deal with this banter with you any longer. Live your life. Enjoy your money and your home. I will be moved by May 1st.

Not your weapons any more.

Respondent's Exhibit No. 38
C. Sinatra Letter to F. Sinatra

**EXHIBIT**



R38

# CONFIDENTIAL
# MEANT FOR FRANKS EYES ONLY

-----------------------------------------------

## CYNTHIA SINATRA
Attorney and Counselor at Law
2120 Welch Street
Houston, Texas 77019
(713) 225-8500
(713) 523-7887 FAX
cynthiasinatra@aol.com
Sinatralaw.com
August 22, 2008


Dear Francis,

It is so difficult to begin to thank you for so many very precious moments that we had together.

The fun we had when you were doing the Amory, Jr. show. You were smiling then.
The helicopter ride over the Amazon right at treetop and the intellectual encounters with our little people, the monkeys was a once in a lifetime experience.

The overwhelming success of the concert out in the Amazon in Manus, was one of the mythically exciting moments in my history as being your Sinatra groupy. It was fun.

We had fun in Salvador, Curitibu, Rio, Sao Paulo, and all of the other places in between. I will be forever thankful to you for sharing this adventure with me.

Thank you for sending my meds. I know that you are reliable. Sid made it clear that this is last time unless I see Dr. Helfingstein.

I am so sorry for your painful and emotional hearing loss. I am going to take it from the optimistic point of view and believe that you will be back to 100:% within a few months.

I know that it will be "some little time" before you would want to see me, but it seems like we are missing another driving trip to go to Vegas on the 1st for you to do the Jerry Lewis Telethon. I love the drive with books on tape. Somehow it places up back into the good old days.

Well, any way.

This is my insufficient attempt to thank you for sharing this adventure with me. The girls and I want to invite you to come for a visit when it is convenient. I think that they may be home the weekend of September 5th. It would really be nice to have all of us together, again.

I miss my family and I miss my Francis.

PLAN B

Francis could invite the Weaspons to drive across the desert with him and, after he does his show, he could hold the Weapons in his arms all night.

We could decide that we love each other so much, this living apart is expensive and painful and My Francis could ask me to stay his wife , put together a model train set together and live on into our future lives together.


I love you and hope that your loss lessens.

Love always,

Your Weapons

Petitioner's Exhibit A
Letter



 PETITIONER'S EXHIBIT



## Law Office of Warren Cole
3355 WEST ALABAMA-SUITE 825
HOUSTON, TEXAS 77098
PHONE: 713-275-4444
FAX: 713-400-9144

Warren Cole
warren@warcolelaw.com

Cali V. Schwarz
cali@warcolelaw.com

March 5, 2014

**<u>Via Facsimile (979) 531-0355</u>**

John C. Maher, Jr.
212 E. Burleson Street
Wharton, Texas 77488

> RE:    Cause No. 46,184; *In the Matter of the Marriage of Cynthia Sinatra and Francis Wayne Sinatra*; In the 329th Judicial District Court of Wharton County, Texas

Dear Mr. Maher,

I received via fax today your designation of experts. I see that you have designated Charlie Gerhardt as an expert in the Sinatra case. I have known Charlie for years and have worked with him and against him on many occasions. In order to expedite this matter and get to the real disagreements regarding the property I am suggesting that Charlie be able to directly communicate with Randy O'Connor. Prior to such a conversation, I think it would be a good idea if we all had a conference call so we can figure out what Charlie really needs as opposed to continuing a useless paper chase.

Please give this some thought and consideration and let me know if it appeals to you. I am just afraid if we continue to bombard each other with discovery that all we will do is incur needless fees.

Very truly,

Warren Cole

cc:    Susan T. Goldstein
Randy O'Connor
Frank Sinatra, Jr.

# Law Office of Warren Cole
3355 WEST ALABAMA-SUITE 825
HOUSTON, TEXAS 77098
PHONE: 713-275-4444
FAX: 713-400-9144

Warren Cole
warren@warcolelaw.com

Cali V. Schwarz
cali@warcolelaw.com

## TELECOMMUNICATIONS
### CONFIDENTIAL AND PRIVILEGED

· To comply with U.S. Treasury regulations, we advise you that any discussion of Federal tax issues in this communication was not intended or written to be used, and cannot be used, by any person (i) for the purpose of avoiding penalties that may be imposed by the Internal Revenue Service, or (ii) to promote, market or recommend to another party any matter addressed herein.

This transmission and all attachments (if applicable) contains confidential information belonging to the sender and are legally privileged. The information is intended only for use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on the contents of this transmission is strictly prohibited. If you have received this transmission in error, please notify us immediately at (713) 275-4444, delete the transmission from all forms of electronic or other storage, and destroy all hard copies. Do NOT forward this transmission. Thank you.

DATE:        March 5, 2014                    PAGES: _2_
                                              (including the fax cover sheet)
FROM:        Warren Cole

TRANSMITTED TO THE FOLLOWING:

|     | NAME              | LAW FIRM        | PHONE NUMBER | FAX NUMBER     |
|-----|-------------------|-----------------|--------------|----------------|
| 1.  | John C. Maher, Jr.| Attorney at Law |              | 979/531-0355   |
| 2.  |                   |                 |              |                |
| 3.  |                   |                 |              |                |
| 4.  |                   |                 |              |                |
| 5.  |                   |                 |              |                |

## IF ANY PROBLEMS ARISE, PLEASE CALL (713) 275-4444.

DOCUMENTS TRANSMITTED: **Cause No. 46,184; In the Matter of the Marriage of Cynthia Sinatra and Francis Wayne Sinatra; In the 329th Judicial District Court of Wharton County, Texas**

**Please see attached letter.**

Petitioner's Exhibit B
Letter

Subject: Sinatra Divorce

From: Charlie Gerhardt (charlie@gerhardtcpa.com)

To: warren@warcolelaw.com;

Cc: johncmaher@sbcglobal.net; ryan@gerhardtcpa.com;

Date: Wednesday, March 19, 2014 8:56 AM



PETITIONER'S EXHIBIT



Warren:

It has been suggested that I go directly to the accountant. Sounds fine with me. Please send contact information. I will get my arms around what I need in the next couple of weeks.
As I move forward, I will keep You and Mr. Maher advised of my progress with follow up emails.


Charlie Gerhardt CPA

5615 Kirby #640

Houston, Texas 77005

713-520-5592 - Office

713-520-9968 - Fax


This correspondence is a part of my work product and can be subpoenaed. It is confidential and intended only for my clients and/or designated Parties use. It is not to be considered "Tax Advice" or to be used as "Tax Advoidance". If you received this in error, please notify me and delete copy.

Petitioner's Exhibit C
Email

**From:** Warren [mailto:warcole@gmail.com]
**Sent:** Tuesday, April 22, 2014 7:03 PM
**To:** Charlie Gerhardt
**Cc:** A. Gonzalez Ernesto
**Subject:** 2014-04-21 FWS Prelim Inventory (eag).pdf

Charlie, I know you are leaving tomorrow and wanted to get this to you. I have referenced the assets to the respective proof. What we have not completed is the time line for the mutations on some of the entities. All supporting docs have been produced. Please feel free to call or email with any questions. You are welcomed to send direct to Ernie with copy to me.

Have a safe trip.

P.S. the FWS trust and Anomoly are merely flow throughs. I expect to supplement the last inflow/outflow schedule by month end.

2014-04-21 FWS Prelim Inventory (eag).pdf attached



PETITIONER'S EXHIBIT

C

Warren Cole
Sent from my iPad

| ASSET/LIABILITY | BAL. AS OF | PARTY IN POSS | COM. VALUE | HUS. SEP. | WIFE SEP. | NOTES |
|---|---|---|---|---|---|---|
| **REAL ESTATE** | | | | | | |
| 9706 Hensel Rd., Beverly Hills, CA Lot 9 of Tract No. 21845, per map recorded in Book 619, pages 83 and 84 Inclusive of Maps | | | | 4,600,000.00 | | See Grant Deed - *FWS02518 to FWS002519* "John Eckel and Gwenn Eckel GRANT to Francis Wayne Sinatra, *Trustee of the Francis W. Sinatra Trust dated June 15, 1998*" |
| Less Mortgage CNB Finance | | | | (2,500,000.00) | | Adjustable Rate Mortgage executed August 8, 2012 - City National Bank for $1,800,000 -FWS Trust paid the $1,800,000 on 12-20-2007 (FWS 002520 to FWS 002525 )  See also Deed of Trust (August 8, 2012) (FWS002527 to FWS002543) "Borrower" Francis Wayne Sinatra - "Trustor" Francis Wayne Sinatra, Trustee of the Francis W. Sinatra Trust"  See also Scheudle A - 2007 Tax return (FWS000853) Line 10 - "Home mortgage interest paid and reported on for 1098 - ($53,753) |
| 1913 Kelving Way, Wharton TX (50% undivided interest) Lot Five (5) LESS, SAVE and EXCEPT the Northwest 12'... | | | | 235,000.00 | | January 20, 2005 Deed of Trust executed - "CS and FSW" "Single Person" |
| Less 1/2 Mortgage Amegy Mortgage Company - Loan No. 1XXXXXXX3225 | | | | (140,000.00) | | Need current mortgage balance (value shown estimate only) |
| **CASH/BANK ACCOUNTS** | | | | | | |
| | | | | | | |
| **AUTOS/BOATS/OTHER VEHICLES** | | | | | | |
| 2014 Lexus GX460 -VIN# JTJJM7FX9E5071114 | | | | 72,000.00 | | Purchased December 30, 2013; trade in was $42,000.00, $20,000 borrowed from friend, George Kalinsky, $10,000 advance from sale of his Dad's memorabillia, and $4,306.96 came from FWS himslef. See Warren's letter of January 16, 2014 to Mr. Maher, Jr. with attachments. |
| **INVESTMENTS/BROKERAGE ACCTS.** | | | | | | |
| **BUSINESS INTERESTS/TRUSTS** | | | | | | |
| Anomoly Limited, LLC (100% interest) | | | - | | | |
| FWS Reality Delaware, LLC (331/3% interest) | | | | 1,200,000.00 | | See FWS002915 to FWS002933 and FWS002934 |
| Less deferred tax liability | | | | (3,000,000.00) | | |
| Frank W. Sinatra Trust (Est June 15, 1998) | | | | | | Francis W. Sinatra Trust (est June 15, 1998 See *FWS002936 to FWS002962* FWS Amendment and Restatement - 09-20-2005 *FWS002936 to FWS002962* |
| Dorchester Real Estate, LLC(33 1/3% interest) | | | | 285,000.00 | | Dorchester Real Estate , LLC formed by Nancy Sinatra on 03-24-2011 NSL, FWS, and TS all receive 33 1/3% on 12-11-2011) FWS002272 to FWS002307 |

| ASSET/LIABILITY | BAL. AS OF | PARTY IN POSS | COM. VALUE | HUS. SEP. | WIFE SEP. | NOTES |
|---|---|---|---|---|---|---|
| Cause No. 46, 184 | | PRELIMINARY INVENTORY OF FRANCIS W. SINATRA, JR. | | | | |
| 329TH District Court | | | | | | |
| Wharton County, Texas | | | | | | |
| | | | | | | |
| FSE HOLDCO, LLC (20.09% interest) | | | | 1,700,000.00 | | FWS002236 to FWS00238<br><br>11-19-2007 FWS acquired interest in Holdco<br>FWS exchanged his interest in Bristol Production L.P> (21.75%), Essex Production L.P. (33%) and Sheffield Enterprises, Inc. (27%) |
| *PENSION/RETIREMENT/IRAS* | | | | | | |
| Screen Actor's Guild (SAG) | | | | | | Confirmed as FSW's SP - Page 21 of 24 of Post Marital Agreement |
| American Federation of Television & Radio Artists (AFTRA) | | | | | | Confirmed as FSW's SP - Page 21 of 24 of Post Marital Agreement |
| American Federation of Musicians (AFM) | | | | | | Confirmed as FSW's SP - Page 21 of 24 of Post Marital Agreement |
| *LIFE INSURANCE* | | | | | | |
| | | | | | | |
| First Colony Life Insurance policy number 2153436 | | | | | | Confirmed as FSW's SP - Page 21 of 24 of Post Marital Agreement |
| First Colony Life Insurance policy number 2350893 | | | | | | Confirmed as FSW's SP - Page 21 of 24 of Post Marital Agreement |
| Union Central Life Insurance policy number 03041827 | | | | | | Confirmed as FSW's SP - Page 21 of 24 of Post Marital Agreement |
| American Federation of Musicians, Local 47 Policy | | | | | | Confirmed as FSW's SP - Page 21 of 24 of Post Marital Agreement |
| *PERSONAL PROPERTY* | | | | | | |
| | | | | | | |
| Furniture & Furnishings | | | | 400,000.00 | | |
| *MISCELLANEOUS* | | | | | | |
| Promissory Note<br>Cynthia Sinatra to Frank Sinatra (01-10-2005) | | | | 40,000.00 | | FWS000056 - signed 01-10-2005<br>$40,000 plus interest at 5% due and payable pon the sake of 3420 Old Canney Road, Wharton, Texas 77478. |
| **TOTAL GROSS ESTATE** | | | 0.00 | 2,892,000.00 | 0.00 | |
| *LIABILITIES (enter as negatives)* | | | | | | |
| | | | | | | |
| Payables | | | 0.00 | | | |
| | | | | | | |
| **TOTAL LIABILITIES** | | | 0.00 | | | |
| **NET ESTATE** | | | 0.00 | 2,892,000.00 | 0.00 | |

Petitioner's Exhibit D
Email

| Subject: | RE: Sinatra |
| --- | --- |
| From: | Warren Cole (warren@warcolelaw.com) |
| To: | charlie@gerhardtcpa.com; |
| Cc: | johncmaher@sbcglobal.net; |
| Date: | Thursday, May 29, 2014 8:23 AM |

Charlie, Don't know if this will help but it is an updated to/from Cynthia taken from all tax returns.

**From:** Charlie Gerhardt [mailto:charlie@gerhardtcpa.com]
**Sent:** Thursday, May 29, 2014 7:56 AM
**To:** Warren Cole
**Cc:** John Maher
**Subject:** Sinatra



PETITIONER'S
EXHIBIT

D

Warren:
John and I are meeting Friday.

Charlie Gerhardt CPA

5615 Kirby #640

Houston, Texas 77005

713-520-5592 - Office

713-520-9968 - Fax

This correspondence is a part of my work product and can be subpoenaed. It is confidential and intended only for my clients and/or designated Parties use. It is not to be considered "Tax Advice" or to be used as "Tax Advoidance". If you received this in error, please notify me and delete copy.

| | | | SCH. C | CAP G/L | | FEDERAL | STATE | REMAINING |
|---|---|---|---|---|---|---|---|---|
| YEAR | WAGES, ETC. | INTEREST | DIVIDENDS | INCOME | LOSSES | PTRSHPS | TAXES PAID | TAXES PAID | COM $$ [1] |
| 2003 | 1,906 | 10,448 | 285 | (128,247) | (3,000) | 748,387 | (147,563) | (47,932) | 437,284 |
| 2004 | 154 | 8,333 | 474 | (152,304) | (3,000) | 705,323 | (126,152) | (41,304) | 394,524 |
| 2005 | 27,489 | 23,905 | 38,322 | (359,617) | 1,364,359 | 1,224,181 | (505,134) | (219,377) | 229,769 |
| 2006 | 4,995 | 46,534 | 4,885 | (159,723) | (3,000) | 1,101,857 | (259,377) | (84,413) | 654,758 |
| 2007 | 7,307 | 22,436 | 24,725 | (44,566) | 12,367,795 | 30,338 | (1,848,998) | (1,149,552) | (2,958,310) |
| 2008 | 6,455 | 55,426 | 22,664 | (249,138) | 1,202 | 1,182,353 | (259,864) | (77,889) | 680,007 |
| 2009 | 9,017 | 18,649 | 1,602 | (102,050) | (200) | 486,472 | (93,407) | (23,345) | 296,938 |
| 2010 | 18,949 | 438 | 324 | 121,509 | 1,303 | 543,044 | (198,447) | (51,724) | 434,093 |
| 2011 | 17,098 | 903 | 134 | 114,447 | (289) | 445,864 | (167,956) | (47,446) | 363,044 |
| 2012 | 4,364 | 14,092 | 4,809 | 124,671 | 5,550 | 479,813 | (180,503) | (62,981) | 384,265 |
| 2013 | 4,288 | 14,699 | 14,358 | 132,248 | 4,671 | 188,084 | (105,422) | (21,134) | 227,121 |
| Totals | 102,022 | 215,863 | 112,582 | (702,770) | 13,735,391 | 7,135,716 | (3,892,823) | (1,827,097) | 1,143,493 |

SUMMARY OF $$ TO/FOR BENEFIT OF CS

1 This amount reflects only what may have been deemed as community income. All CG/Losses are not included since that would be separate property.

| TO |
| --- |
| **C. SINATRA** |
| 194,002 |
| 88,574 |
| 818,839 |
| 503,347 |
| 903,706 |
| 1,009,921 |
| 434,362 |
| 315,759 |
| 283,647 |
| 113,320 |
| 47,182 |
| **4,712,659** |